UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA      :

           :     **OPINION AND ORDER**

v.         :

           :     22 CR 390-1 (VB)

GLENN GRIFFIN,         :

               Defendant.    :
-------------------------------------------------------x

Briccetti, J.:

By motion dated November 21, 2024 (Doc. #87), defendant Glenn Griffin seeks to withdraw the guilty plea he entered on August 26, 2024. During a change of plea hearing before Magistrate Judge Victoria Reznik, Griffin pleaded guilty to one count of conspiracy to commit bribery and one count of conspiracy to commit wire fraud.

Griffin argues he should be allowed to withdraw his plea for two reasons. First, he contends his plea was not knowing and voluntary because his prior counsel, Stephen J. McCarthy, Jr., Esq., improperly pressured him to plead guilty. Second, Griffin maintains "intervening developments" since the plea hearing—namely, the purported "recantation" of a government witness and Griffin's recognition that one of the charges against him was "legally infirm"—have revealed the government's case to be "substantially weaker" than he "was initially led to believe" by Mr. McCarthy. (Doc. #88 ("Def. Mem.") at 12, 14). The government opposes Griffin's motion, arguing that the guilty plea was knowing and voluntary and there is no fair and just reason for it to be withdrawn. (Doc. #103).

For the reasons set forth below, the motion is DENIED.

**BACKGROUND**

I.   <u>The Indictment</u>

Griffin was arrested on July 21, 2022, on an indictment naming him and a co-defendant, Robert Dyckman. According to the indictment, Griffin, the owner of a large landscaping company and a nursery, conspired with and bribed Dyckman, an employee of the Town of Cortlandt, New York, to allow Griffin's companies to dump hundreds of loads of unauthorized materials at a Town of Cortlandt facility called Arlo Lane. In exchange for Dyckman giving Griffin and Griffin's employees improper access to the Arlo Lane facility, Griffin allegedly paid Dyckman cash bribes and, through his companies, provided free landscaping work and other home repair services to Dyckman and Dyckman's relatives. The indictment quotes numerous text messages sent between Griffin and Dyckman, in which the two purportedly coordinated the illegal dumping at Arlo Lane and discussed benefits that Griffin provided to Dyckman, including submitting a fraudulent insurance claim on Dyckman's behalf and recommending Dyckman to another employer.

Separately, the indictment alleges Griffin engaged in a bid-rigging scheme designed to defraud municipalities by submitting sham and inflated bids for public projects so that entities Griffin controlled would be the low bidder and thereby obtain the work.

Griffin was charged in six counts: conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (Count One); bribery, in violation of 18 U.S.C. §§ 666(a)(2) and 2 (Count Two); conspiracy to misapply and convert local government property, in violation of 18 U.S.C. § 371 (Count Four); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Five); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Six); and aggravated identify theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2 (Count Seven).

Griffin retained Stephen J. McCarthy, Jr., Esq., as his defense counsel.

II.    <u>The Change of Plea Hearing</u>

On August 26, 2024, the government filed a superseding information, charging Griffin with one count of conspiracy to commit bribery relating to the illegal dumping scheme and one count of conspiracy to commit wire fraud relating to the bid-rigging scheme.  As overt acts for the bribery conspiracy count, the superseding information recites text messages allegedly sent between Griffin and Dyckman regarding the illegal dumping scheme.  Regarding the wire fraud conspiracy count, the superseding information alleges Griffin "ma[de] and caus[ed] others to make materially false statements in bids for work and related documents" submitted to municipalities, including Croton-on-Hudson and Verplanck.  (Doc. #58 ("Superseding Information") at ¶ 5).

That same day, Griffin waived indictment and entered a guilty plea to both counts of the superseding information before Judge Reznik.  At the change of plea hearing, the parties submitted a signed plea agreement dated August 2, 2024, to which a proposed consent preliminary order of forfeiture and money judgment was attached.  The parties had signed both documents the day of the plea.  The plea agreement included a stipulated loss amount of $1.2 million and a stipulated Sentencing Guidelines range of 37 to 46 months' imprisonment.

Judge Reznik engaged in a lengthy colloquy with Griffin.  After confirming that Griffin had spoken with Mr. McCarthy before the hearing about its purpose, the magistrate judge asked if he had reviewed the information with Mr. McCarthy, if he had "sufficient time to consult with [Mr. McCarthy] about the information," and if he understood the charges against him.  (Doc. #67 ("Guilty Plea Hr'g") Tr. at 5).[1]  Griffin answered "[y]es" to each question.  (<u>Id</u>.).   The magistrate

_____

[1]    Citations to "Tr. at ___" refer to the page numbers at the top right of each transcript page.

judge then asked Mr. McCarthy if he had reviewed the information with Griffin and was satisfied that Griffin "underst[ood] the charges against him." (Id.). Mr. McCarthy responded that he and Griffin "had a thousand conversations about this matter in person, on the phone, via text messages; and we've had an opportunity to review this document in the past two weeks." (Id.). Mr. McCarthy also stated that "no one in the courtroom is more clear on what we are doing here than Mr. Griffin." (Id.). Griffin did not respond or object to Mr. McCarthy's assertions.

Judge Reznik then attempted to confirm with Griffin that he consented to proceeding before her, rather than before a district judge, which led to the first of two temporary interruptions. Although Griffin stated no one threatened him to sign the consent form to proceed before a magistrate judge, and also stated he signed the form freely and voluntarily, Mr. McCarthy interjected to note "it's obvious to anyone in the courtroom in the last two questions, Griffin was very hesitant and seemed somewhat combative." (Guilty Plea Hr'g, Tr. at 13). To avoid any impression that Griffin "[wa]sn't quite clear exactly what he [was] doing," Mr. McCarthy asked Judge Reznik to repeat her previous two questions to Griffin. Id. She did so, and Griffin gave the same answers as before. The magistrate judge then asked, "is there any reason that you are hesitating before giving your answer?" (Id.). Griffin responded "I'm not allowed to say anything, Your Honor. If I did, it would be held against me. I can't—it's too late now, so the answer is no." (Id., Tr. at 14).

At that point, the government asked for a recess so that Mr. McCarthy could "confer with his client . . . regarding his last statement." (Guilty Plea Hr'g, Tr. at 14). Judge Reznik agreed and called a recess.

Back on the record, Mr. McCarthy explained he had spoken to Griffin, and elaborated on Griffin's perspective regarding the guilty plea:

4

> Mr. Griffin just has one issue with it in his own mind relevant to an amount of restitution that's due, but it's really a peripheral issue. In terms of the nuts and bolts of the criminal justice resolution here, it's very fair. And so what his—in his mind he is thinking that, hey, I've got to take this today. I'm being forced to take this today. It's such a good result I can't not take it. So he is doing this voluntarily. He does want to proceed with you. . . . I think he is prepared to answer that question directly if you ask him again. In his own mind, when you said: Is anyone forcing you, he is not being forced except by his own logic, recognizing that, boy, this is a good result. I should take it.

(Guilty Plea Hr'g, Tr. at 15). The magistrate judge accepted that explanation and, after confirming with Griffin that he was indeed consenting to proceeding in front of her, found that Griffin was competent to waive indictment and proceed with the guilty plea.

Before beginning with the plea colloquy, Judge Reznik instructed Griffin to answer her questions truthfully, so she could "make sure that you understand your rights," confirm "you are pleading guilty of your own free will," and "make sure that you are pleading guilty because you are guilty and not for some other reason." (Guilty Plea Hr'g, Tr. at 16–17). Griffin confirmed that he understood the magistrate judge's instruction.

Judge Reznik then asked Griffin if he had reviewed the charges against him with Mr. McCarthy, if Mr. McCarthy had "told [him] the consequences of pleading guilty," and if he was "satisfied with [Mr. McCarthy's] representation" of him. (Guilty Plea Hr'g, Tr. at 17). Griffin answered "yes" to each question. The magistrate judge also asked her deputy clerk to verify Griffin's signature on the plea agreement and consent order of forfeiture. In response to the clerk's questions, Griffin confirmed he had read and reviewed both documents with Mr. McCarthy before signing them. Mr. McCarthy informed Judge Reznik that he reviewed the plea agreement with Griffin "before court began this morning" and "on a dozen other days as well." (Id., Tr. at 19–20). Griffin did not contest that statement.

Judge Reznik next asked Griffin several more questions regarding his understanding of, and the validity of, the plea agreement. In response, Griffin confirmed, <u>inter</u> <u>alia</u>: (i) he read and reviewed the plea agreement and forfeiture order with Mr. McCarthy before signing each document; (ii) he believed the plea agreement contained "the complete agreement between [him] and the government"; (iii) he signed the plea agreement freely and voluntarily; (iv) no one forced, coerced, or threatened him, or made any promises to him, in order to induce him to sign the agreement; (v) he understood that he faced a total maximum term of ten years' imprisonment, as well as a term of supervised release; and he (vi) understood that he had an "absolute right" to plead not guilty and proceed to trial. (Guilty Plea Hr'g, Tr. at 18–28). At the conclusion of this questioning, Griffin confirmed he understood everything just discussed and had no questions.

The magistrate judge then asked the government to summarize the elements of the offenses and the evidence the government would present at trial to establish those elements. The government did so in detail. When the government concluded its recitation, Judge Reznik asked Griffin if he understood what the prosecutor had just said, to which Griffin responded "[y]es." (Guilty Plea Hr'g, Tr. at 34.) She then asked how he wished to plead to both counts of the superseding information, to which Griffin responded, "Guilty, Your Honor." (<u>Id</u>.). He also confirmed that no one had threatened, coerced, pressured, or otherwise made promises to him (other than promises in the plea agreement)—including about the length of a potential sentence—in order to induce him to plead guilty.

The colloquy took another turn when the magistrate judge asked Griffin to say in his own words "what you did to commit these crimes." (Guilty Plea Hr'g, Tr. at 34). Griffin responded by partially admitting to some of the charged conduct; he acknowledged that he "gave Bobby Dyckman a couple hundred bucks a few times around the holidays as . . . [a] gratuity," and said

that, "as far as the bids . . . I did ask people over time to help me just because I was—I had

relationships with people, and I did ask other people to put in some bids," but asserted that he

"didn't do it with all the ones that they said" (Id., at Tr. 34–35). Griffin explained that "[i]t did

happen. I just—it wasn't as detailed as [the prosecutor] had expressed." (Id., Tr. at 35). When

Judge Reznik asked if Griffin had agreed to an illegal dumping scheme, he responded, "No."

(Id.). But when she asked if Griffin "had an agreement to provide money to certain people to do

that dumping," he responded: "In—for just to make this easier on everybody, yes, Your Honor.

But it was . . . if it was a few hundred dollars a couple of times, and I had permission for years

and years and years." (Id., at Tr. 36). He also said he did not do "anything illegal" when it came

to submitting bids to the different municipalities. (Id., Tr. at 37).

At that point, the magistrate judge addressed the government, observed that Griffin had

not provided "a clear explanation . . . about the allegations" in the superseding indictment, and

asked the government if it wanted Griffin to review "particular questions or facts" with her about

the allegations in order to complete the allocution. (Guilty Plea Hr'g, Tr. at 37). The

government agreed with that characterization, and Judge Reznik suggested the parties take

another recess, during which they could review questions that she could pose to Griffin to

complete the allocution. The government and Mr. McCarthy agreed.

After this second recess, the parties explained that Mr. McCarthy proposed to put certain

questions directly to Griffin, which he would answer. The magistrate judge agreed to that

proposal and Mr. McCarthy proceeded to ask Griffin several questions regarding the conduct

charged in the superseding information. Specifically, he asked:

> i.    whether Griffin paid or gave something of value to Dyckman in exchange for access
>        to the Arlo Lane facility to dump otherwise prohibited material;

    ii.     whether Griffin knew that giving money or something of value to Dyckman was illegal;

    iii.    whether Griffin knew that Dyckman worked for the Town of Cortlandt;

    iv.    whether the money and/or goods provided to Dyckman were bribes so that Griffin could gain otherwise prohibited access to the town dump;

    v.     whether Griffin submitted or directed to be submitted bids from one of his companies on behalf of other entities, without their permission;

    vi.    whether Griffin caused those sham proposals to be submitted "in an effort to obtain work";

    vii.    whether Griffin failed to disclose the existence of the sham proposals to the listed entities; and

    viii.   whether Griffin knew this conduct was wrong or illegal.

(Guilty Plea Hr'g, Tr. at 39–42).  Griffin answered "[y]es" to every question.  (Id.).

Judge Reznik then asked the parties if there was any reason why she should not recommend acceptance of Griffin's guilty plea.  Both Mr. McCarthy and the government had no objection, and Griffin did not voice any concerns himself.  The magistrate judge then found that Griffin's guilty plea was "knowing and voluntary and . . . supported by an independent factual basis for each and every element of the crimes charged."  (Guilty Plea Hr'g, Tr. at 44).  She therefore reported and recommended that the Court accept the plea.

On September 10, 2024, this Court approved and accepted Judge Reznik's report and recommendation, and directed the Clerk to enter the plea.  (Doc. #70).

III.    <u>Griffin's Motion to Withdraw His Guilty Plea</u>

On November 21, 2024, almost three months after he entered his guilty plea, Griffin moved to withdraw his plea.  Represented by new defense counsel, he now contends his guilty plea was not voluntary and advances two arguments in support of that position.

First, Griffin maintains his guilty plea was not voluntary because Mr. McCarthy both misled and pressured him into accepting the plea. He asserts that, during the years leading up to the plea hearing, Mr. McCarthy "repeatedly reassured" Griffin and his family that he "would not face a custodial sentence" if he pleaded guilty. (Def. Mem. at 3). As evidence thereof, Griffin attaches to his motion declarations from himself and his wife, Cheryl Griffin.

Griffin avers that Mr. McCarthy told him "the Government's case was weak" and "insisted that it would 'go away.'" (Doc. #87-1 ("Griffin Decl.") at ¶ 5). Mr. McCarthy also allegedly told Griffin "If anything, I will have a misdemeanor like a parking ticket" and promised Griffin would "not go to jail" "on my watch." (Id. at ¶ 6). Griffin maintains that Mr. McCarthy repeated "[t]hese reassurances" "up until August 2024," when Griffin decided to accept the offered plea agreement. (Id. at ¶ 7). Cheryl Griffin also avers that Mr. McCarthy repeatedly assured her and her husband that the government's case against Griffin was weak and Griffin would not "go to jail." (Doc. #87-2 ("Cheryl Griffin Decl.") at ¶ 3). According to Griffin, the plea agreement "was the culmination of [Mr. McCarthy's] persistent assurances" "that pleading guilty would not result in Griffin receiving a custodial sentence," and "[t]hese statements heavily swayed" his decision to plead guilty. (Def. Mem. at 4).

Yet, despite Mr. McCarthy's promises, Griffin alleges that Mr. McCarthy "did not review the entire plea agreement with me in advance" of the August 26 change of plea hearing. (Griffin Decl. at ¶ 9). In fact, he claims he "did not learn the specific details of the plea until we were sitting outside the courtroom" that day. (Id.). Griffin asserts that Mr. McCarthy never explained prior to August 26 that the stipulated Guidelines range included in the plea agreement "called for a substantial custodial sentence." (Id. at ¶ 18).

He also claims that, on the day of the hearing, he "felt immense pressure from Mr. McCarthy to plead guilty," which Griffin did not want to do.  (Griffin Decl. at ¶¶ 14–15).  Even when Griffin "expressed hesitancy and reluctance" during the plea hearing, Mr. McCarthy allegedly pressured him during the first recess called by Judge Reznik, "stating my only options were to plead guilty or face substantial jail time."  (Id. at ¶¶ 20–21).  Griffin also claims Mr. McCarthy "abruptly" changed his assessment of the merits of the case against Griffin, and instead told Griffin for the first time on August 26 that "the case against me was very strong and I would lose if I went to trial."  (Id. at ¶ 22).  "As a result of this unrelenting pressure," Griffin argues he "had no choice but to rely entirely on Mr. McCarthy's assurances when I decided" to plead guilty.  (Id. at ¶ 29).

Second, Griffin maintains "intervening developments" that came to light after the August 26 plea hearing "have weakened the government's case" and undermined Mr. McCarthy's representations to Griffin that the case against him was "very strong"—which Griffin claims he relied on when agreeing to plead guilty.  (Def. Mem. at 1, 12).

Regarding those "developments," Griffin claims he never would have pleaded guilty had he known that the government's main witness against him—Dena Burke, Dyckman's romantic partner—had significant credibility issues that Mr. McCarthy failed to pursue.  According to Griffin, "[o]n July 7, 2023, Ms. Burke provided an affidavit expressing that she felt pressured and intimidated by the Government throughout her involvement in the case," yet "Mr. McCarthy failed to conduct a follow-up interview with Ms. Burke until three months" after the August 26 plea hearing.  (Def. Mem. at 6–7).

Griffin alleges that, in November 2024, Ms. Burke recanted her grand jury testimony during an interview with Mr. McCarthy.  Griffin did not attach an affidavit from Ms. Burke to

his motion, but rather an email from Mr. McCarthy to Griffin's new counsel, dated November 14, 2024, in which Mr. McCarthy summarized his November 11 interview with Ms. Burke. Mr. McCarthy wrote that Ms. Burke told him: (i) on the morning of her grand jury testimony she was under the influence of alcohol and medication; and (ii) contrary to her grand jury testimony, Ms. Burke did "not at all remember testifying as to seeing any money, or envelope containing money, pass between" Griffin and Dyckman. (Doc. #87-6 at 1–2). In Griffin's view, Mr. McCarthy's "failure to promptly investigate Ms. Burke's credibility and the inconsistencies in her testimony" before he pleaded guilty "further undermine[d] the fairness" of his guilty plea. (Id.).

Griffin asserts that he accepted the guilty plea "in large measure because of his fear" that, if he went to trial and was convicted on Count Seven of the indictment—aggravated identify theft, in violation of 18 U.S.C. § 1028A—he would have faced a mandatory two-year prison sentence. (Def. Mem. at 14). On this point, Griffin contends that the "alleged evidence underlying the count" shows he never "possessed or utilized the means of identification of 'another person,'" as required for conviction under Section 1028A, because the definition of "person" does not include corporate entities—and he was accused of submitting sham bids on behalf of corporate entities, not individuals. (Id. at 14–15).

Lastly, Griffin contends his guilty plea was "influenced by the Government's disingenuous insertion of the loss figure of $1.2 million into the Sentencing Guidelines calculation, notwithstanding only $220,000 being 'traceable' to the offenses" to which he pleaded guilty. (Def. Mem. at 20). As such, he criticizes the government's loss figure and argues that "[p]redicating" his sentence on such a flawed amount is "not only improper fact-finding, but also risks a serious miscarriage of justice." (Id. at 22).

11

IV.    The Evidentiary Hearing

Upon the filing of Griffin's motion, the Court adjourned the previously scheduled sentencing hearing and scheduled a hearing for December 5, 2024, at which Griffin, his new counsel, Mr. McCarthy, and the government were ordered to appear.  The Court also informed the parties that, at the December 5 hearing, Griffin, Cheryl Griffin, Mr. McCarthy, and Monica Hughes (an attorney at Mr. McCarthy's firm who worked with him on Griffin's case) should be "prepared to answer the Court's questions under oath regarding this matter."  (Doc. #95).[2]

At the hearing, which lasted more than six hours, the Court heard testimony from Griffin, Mr. McCarthy, and Ms. Hughes.[3]  Prior to taking the testimony, the Court explained that because "there's a lot on the line here," it was "determined to find out what happened."  (Doc. #111-1 ("Evidentiary Hr'g"), Tr. at 17).  The Court also said it would conduct the questioning itself, although it would allow both counsel to object and also to propose additional questions after the Court completed its questioning of each witness.  Both the government and Griffin's new counsel agreed to this procedure.

A.    Stephen McCarthy's Testimony

Mr. McCarthy testified first and unequivocally denied Griffin's allegations.  In describing his approach to representing Griffin, Mr. McCarthy explained that his opinion of the

---

[2]    In advance of the hearing, Griffin's new attorney advised the Court in writing that Griffin "affirmatively waive[d] the attorney-client privilege with respect to" four topics relevant to his motion: (i) "[d]iscussions with Mr. McCarthy concerning the plea agreement," (ii) "[d]iscussions with Mr. McCarthy concerning the viability of the Aggravated Identity Theft charge (18 U.S.C. § 1028A)," (iii) "[d]iscussions with Mr. McCarthy concerning Dena Burke," and (iv) "[d]iscussions with Mr. McCarthy concerning the plea allocution that took place on August 26, 2024."  (Doc. #98).  At the December 5 hearing, Griffin confirmed that waiver on the record.

[3]    The Court also granted Mr. McCarthy's motion to withdraw as Griffin's attorney, which he made after Griffin moved to withdraw his guilty plea.

government's case changed over time.  According to Mr. McCarthy, Griffin retained Mr. McCarthy in early 2020 to represent him in a criminal investigation—over two years before Griffin was indicted in July 2022.  Mr. McCarthy testified that during the pre-indictment period, he understood the government to be focused on only illegal dumping and other minor allegations.  He also advocated vigorously on Griffin's behalf and thought he was successful in convincing the government not to pursue certain charges.  Therefore, he represented to Griffin that incarceration was unlikely, based on his understanding of the probable charges.

As such, Mr. McCarthy explained that the quotes attributed to him in Griffin's and Ms. Griffin's declarations were not per se false, but rather taken out of context.  He was much more confident in Griffin's chances of avoiding imprisonment in 2020-2022 when he understood the investigation to be focused on only minor allegations.  For example, Mr. McCarthy testified he did indeed tell Griffin the case could be resolved with something like a "parking ticket," as both Griffin and his wife alleged in their declarations (Griffin Decl. at ¶ 6; Cheryl Griffin Decl. at ¶ 2), but he did so in 2020, when he was discussing "an allegation that [Griffin's] trucking company [was] dumping inappropriately nonhazardous waste."  (Evidentiary Hr'g, Tr. at 46).  Mr. McCarthy testified Griffin "repeatedly" posed questions to him about the likelihood of incarceration under various hypothetical scenarios, so he would assure his client that he was not "too concerned about you going to jail" due to potential minor illegal dumping charges.  (Id.).  Mr. McCarthy testified that, at the time he gave Griffin these assurances,  he was not aware of any bribery allegations.

That changed once the indictment was unsealed, at which point Mr. McCarthy learned of the bribery allegations and became very concerned.  He explained that he viewed the text

messages quoted in the indictment as particularly "devastating" because he believed they were strong evidence of guilt.  (Evidentiary Hr'g, Tr. at 30).

According to Mr. McCarthy, once his view of the case had changed, he informed Griffin accordingly.  Mr. McCarthy explained he told Griffin that he felt Counts Five through Seven (relating to the bid-rigging allegations) were "triable"—meaning conviction was not a certainty—but he did not believe that going to trial on those counts was the correct choice if that meant going to trial on the bribery counts as well.  (Evidentiary Hr'g, Tr. at 50).  Specifically, he testified he told Griffin the case would be a "loser" at trial because the first four counts—namely, the bribery allegations—would not be "triable."  (Id., Tr. at 69–70, 112).  Mr. McCarthy repeated several times throughout his testimony that he expressed to Griffin his refusal to take the case to trial; e.g., "[I]f he was crazy enough to go to trial, I would not do it, he'd have to get a new attorney."  (Id., Tr. at 176).  Elaborating on this point, Mr. McCarthy explained that he "made clear to [Griffin] that I'm not going to take you just to make money on a . . . suicidal trial.  You're going to lose.  You've got to negotiate a good plea."  (Id., Tr. at 177).  But he denied telling Griffin that, if Griffin refused the plea agreement, Mr. McCarthy would cease representing him.

Mr. McCarthy also denied telling Griffin in the period following the indictment that Griffin would avoid incarceration, because at that point Mr. McCarthy recognized the strength of the government's case against his client.  He explained that he informed Griffin he would do his best to keep him out of jail, but he could not guarantee it in light of the gravity of the charges.

According to Mr. McCarthy, he and Griffin first discussed a possible guilty plea in early 2023, after the government turned over discovery material pursuant to 18 U.S.C. § 3500.  The two returned to that subject "[m]ultiple times every week," "[g]enerally on the telephone,

sometimes in person." (Evidentiary Hr'g, Tr. at 98). Mr. McCarthy explained he advised Griffin that, in light of the text messages, "[i]f we come to a place where the government will offer us a plea that does not include the mandatory two year minimum for aggravated identity theft, we must consider that seriously." (Id., Tr. at 99). Throughout that period, Mr. McCarthy also communicated with the government about the possibility of a plea agreement. But, according to Mr. McCarthy, the government always insisted on a guilty plea that included the Section 1028A charge and the corresponding mandatory minimum sentence, which Mr. McCarthy felt was a non-starter. Mr. McCarthy's principal goal was to guide Griffin to a plea agreement under which incarceration was a possibility, rather than a certainty—but he testified he never promised Griffin he could avoid incarceration by pleading guilty.

In July 2024, Mr. McCarthy received word from the government that it would accept a plea that did not include the Section 1028A charge. Yet, according to Mr. McCarthy—which the government confirmed to the Court—the government also informed him that, if Griffin did not accept the proposed plea offer, it was prepared to supersede the indictment with additional bribery counts. Mr. McCarthy told Griffin of the government's representation.

On August 2, 2024, the government sent the proposed plea agreement to Mr. McCarthy, and he forwarded it to Griffin on August 6, 2024.[4] Between August 6 and August 26, Mr. McCarthy estimated that he and Griffin "talked about [the plea agreement] a few dozen times." (Evidentiary Hr'g, Tr. at 106). He testified he reviewed the terms of the agreement, including the stipulated sentencing range of 37 to 46 months' imprisonment, with Griffin. Mr. McCarthy testified he told Griffin during those conversations "this was probably the best we would ever do

---

[4]     Mr. McCarthy provided the email in which he sent the plea agreement to Griffin, which the Court received in evidence as Court Exhibit 4.

. . . although there were federal prison [sic] indicated in the guidelines, those were advisory, we would do everything we could to . . . present at sentencing important components of [Griffin's] life and try to have a successful sentencing." (Id., Tr. at 111). Yet, despite his insistence that the plea offer was the best possible outcome, Mr. McCarthy testified he knew Griffin was presented with "[a]n extraordinarily tough decision." (Id., Tr. at 113). Griffin was "passionately upset" about the loss calculation included in the plea agreement, because he was "adamant that those were inaccurate and improperly obtained figures." (Id., Tr. at 114). Despite his concerns, Griffin nevertheless eventually agreed to accept the plea offer.

According to Mr. McCarthy, before the hearing began on August 26, Griffin twice told Mr. McCarthy he did not want to plead guilty, before then changing his mind. First, Griffin said, "I really don't want to do this" and was "verbally abusive" to Mr. McCarthy. (Evidentiary Hr'g, Tr. at 129). In Mr. McCarthy's narrative, he responded: "that's fine, you do not have to do this. If you don't want to do this, we will not do it. We'll go in and tell the prosecutor that the deal is off, we'll apologize to the Court and we will restart the negotiations." (Id.). At that point Griffin replied "no, no, we're going to do it." (Id.).

But soon thereafter Griffin again refused to go forward with the guilty plea, and Mr. McCarthy reiterated that it was Griffin's decision and they could inform the government Griffin no longer wanted to plead guilty. Once again, in response to Mr. McCarthy's explanation, Griffin changed course and decided to plead guilty. Mr. McCarthy described this interaction as "a nasty back and forth," in which he informed Griffin that, in his opinion, the government's evidence was strong and would almost certainly result in a conviction at trial. (Id., Tr. at 132). After Griffin's second change of mind, he and Mr. McCarthy entered the courtroom and the plea hearing began.

Mr. McCarthy testified that, during the first recess, he and Griffin again discussed whether Griffin would go forward with the guilty plea. When they returned to the courtroom and Mr. McCarthy told Judge Reznik that Griffin felt he was "being forced to take this today," Mr. McCarthy meant that Griffin "understood the logic" behind pleading guilty. (Evidentiary Hr'g, Tr. at 137).

Mr. McCarthy also testified that, during the second recess, he first spoke with the prosecutor about what questions would be appropriate to pose to Griffin. Then he "alerted" Griffin as to "what questions were coming" before the hearing resumed. (Evidentiary Hr'g, Tr. at 139, 151–52). Again, Mr. McCarthy was adamant he did not pressure Griffin to plead guilty during the second recess, testifying he "in fact told him in no uncertain terms, you don't want to do this, that's fine with me. Twice." (Id., Tr. at 155).

Once the hearing resumed, Mr. McCarthy believed Griffin's affirmations and did not think Griffin was coerced into any factual misrepresentations in his colloquy with Judge Reznik.

Addressing Griffin's allegations that Mr. McCarthy did not investigate Dena Burke's flaws as a government witness until after the August 26, 2024, change of plea hearing, Mr. McCarthy explained that he had, in fact, done so years before the hearing. Indeed, he testified he discussed the subject with Dyckman's defense counsel, who obtained a written statement from Ms. Burke in February 2023, in which Ms. Burke walked back some aspects of her grand jury testimony.[5] Mr. McCarthy also testified he himself interviewed Ms. Burke "four times" in 2023, culminating in an affidavit she signed on July 7, 2023,[6] casting doubt on some of her grand jury

---

[5]    At the evidentiary hearing, the Court received this statement into evidence as Court Exhibit 2.

[6]    This affidavit was received into evidence as Court Exhibit 3.

testimony.  (Evidentiary Hr'g, Tr. at 58).  But Mr. McCarthy was not convinced that any issues

with Ms. Burke's credibility would sufficiently weaken the government's case, given his

comprehensive review of all the facts at his disposal.

Turning to the Section 1028A issue, Mr. McCarthy repeated that he viewed the bid-

rigging allegations, which represented the factual basis for the Section 1028A charge, as

"triable."  (Evidentiary Hr'g, Tr. at 69–70).  But, according to Mr. McCarthy, he discussed only

the factual underpinnings of that charge with Griffin—not the associated legal questions.

While testifying, Mr. McCarthy proffered several documents—billing records and

substantive memoranda that he prepared during his representation of Griffin—for the purpose of

corroborating his testimony.

B.      Monica Hughes's Testimony

Ms. Hughes testified next, and her testimony generally matched Mr. McCarthy's.  She

explained she joined Mr. McCarthy's firm in August 2023 and began working on Griffin's case

shortly thereafter.  Ms. Hughes stated that she did not typically speak to Griffin about the case

outside of Mr. McCarthy's presence, and would direct him to speak to Mr. McCarthy if Griffin

solicited her opinion.

Even in her supporting role, Ms. Hughes testified she observed many interactions—both

phone calls and in-person meetings—between Mr. McCarthy and Griffin throughout her

involvement in the case.  For example, she estimated she witnessed the two men discuss

Griffin's case at least seventy-five times, and that she observed "countless" conversations in

which Griffin peppered Mr. McCarthy with questions about a potential resolution to his case—

including a guilty plea.  (Evidentiary Hr'g, Tr. at 187).  According to Ms. Hughes, those

conversations took on sharper detail after the government informed Mr. McCarthy in July 2024

18

that it would accept a plea that did not include a Section 1028A charge.  After the government

sent the proposed plea agreement to Mr. McCarthy, Ms. Hughes recalled listening to Griffin and

Mr. McCarthy discuss that agreement on multiple occasions.  Although she did not recall the

dates of those discussions, she explained that, for her and Mr. McCarthy, "August . . . pretty

much was entirely focused on Glenn."  (Id., Tr. at 196).  She specifically recalled Griffin became

"very angry at [Mr. McCarthy] because he d[idn't] like the [loss] amount" of $1.2 million.  (Id.,

Tr. at 190).

      During all of the conversations between Mr. McCarthy and Griffin, Ms. Hughes never

heard Mr. McCarthy guarantee a non-jail sentence to Griffin; in fact, she recalled Mr. McCarthy

explaining he could "never tell someone if they're never going to get jail time or not," given that

the Court has the discretion to determine the appropriate sentence in any case.  (Evidentiary

Hr'g, Tr. at 204).  Nor did she observe him pressure or attempt to coerce Griffin to plead guilty.

She explained that, in her view, Griffin felt pressure to plead guilty or face a superseding

indictment.  But she maintained that Mr. McCarthy never did more than give Griffin "an honest

answer" to the question of whether the government would supersede.  (Id., Tr. at 197–98).

      Ms. Hughes further testified that on August 26, the day of the change of guilty plea

hearing, Griffin arrived at the courthouse and, after talking "through the plea for another

umpteenth time," berated Mr. McCarthy, telling him, "I'm so sick and tired of hearing the same

thing out of your mouth. . . .  I don't even want to do this anymore."  (Evidentiary Hr'g, Tr. at

199).  According to Ms. Hughes, Mr. McCarthy "started to pack up" before Griffin agreed to go

forward with the guilty plea, at which point Mr. McCarthy "opened up the plea agreement and

was like let's sit down and go through this . . . before we go in [to the courtroom] and we can

have a solid plan.'"  (Id., Tr. at 200).

19

According to Ms. Hughes, during the second recess, Mr. McCarthy and Griffin reviewed both Mr. McCarthy's questions and the answers Griffin would give to the questions. Griffin said, "can we just get this over with." (Id., Tr. at 202). She also testified that Mr. McCarthy told Griffin during the second recess that Griffin had the right to go to trial, just as Mr. McCarthy had repeated to Griffin "throughout the . . . year and a half I had been working with him." (Id., Tr. at 205).

C.   Glenn Griffin's Testimony

Griffin was the third and final witness at the evidentiary hearing. He repeated several of the allegations made in his declaration. For instance, he testified that "from the first day," Mr. McCarthy told him "this is never going to trial and we're going to plead guilty to something," but that "there's not going to be any jail time." (Evidentiary Hr'g, Tr. at 235). Griffin also testified that, "right from the beginning," Mr. McCarthy told him "the case is a loser . . . [and] if we go to trial, we're never going to win." (Id., Tr. at 236).[7]

But Griffin's testimony largely focused on the August 26 hearing. According to Griffin, he asked Mr. McCarthy to postpone the hearing "about four or five days" before it was scheduled to occur, and Mr. McCarthy agreed. (Evidentiary Hr'g, Tr. at 213). However, the night of August 25, Mr. McCarthy called Griffin and "made him" go to court, explaining that "if I do not show up," the government would "supersede the indictment" and "bring back" the Section 1028A charge (Id.). Griffin testified that, on the morning of August 26, he told Mr. McCarthy he would not come to court, and Mr. McCarthy responded that "it would really benefit you to come in here because if you don't come in today, they might pull . . . everything off the

---

[7]    The Court notes Griffin's testimony in this respect contradicts his declaration, in which he alleged that Mr. McCarthy "abruptly" told Griffin for the first time on August 26 that "the case against me was very strong and I would lose if I went to trial." (Griffin Decl. at ¶ 22).

table." (Id., Tr. at 215). According to Griffin, when he arrived at the courthouse that morning, he was "scared" and became "a little bit testy" with Mr. McCarthy; Mr. McCarthy apparently responded by telling Griffin, "if you don't want to do this . . . here's what's going to happen. . . . They're going to pull [the plea agreement] and add" a superseding indictment. (Id., Tr. at 230). Then, according to Griffin, Mr. McCarthy said the following:

> Glenn, if you don't want to do this, great, but you know the consequences. He said, just let me know what you want to do, because you know the consequences, and it's not going to be good for you. He goes, right now, it could be anything. Or, if you go into the courtroom, there's a very, very good chance you are not going to get any jail time. He goes, if you don't, it could be five years or more.

(Id., Tr. at 230–31). Griffin then entered the courtroom.

Griffin stated he "was confused" once the plea hearing began, that he "really didn't understand what was going on," and he "really didn't understand the plea agreement to the depths that I needed." (Evidentiary Hr'g, Tr. at 216). He testified he did not recall Judge Reznik asking him if he understood the terms of the plea agreement, as well as the nature of the proceedings.

Contradicting the testimony of Mr. McCarthy and Ms. Hughes, Griffin stated he remained inside the courtroom during the second recess and did not discuss any questions or answers with Mr. McCarthy. Rather, according to Griffin, Mr. McCarthy told him "to say yes" and "[a]nswer all the questions and just get through this." (Id., Tr. at 234). In his narrative, Griffin complied because he was "scared and . . . did not know what to do." (Id.). Griffin testified he did not "remember half of what went on that day," reiterating that he was "confused and scared." (Id.).

V.    <u>Post-Hearing Briefing</u>

At the conclusion of the hearing, the Court set a briefing schedule for the government to oppose Griffin's motion and for Griffin to file a reply in support.  It also ordered the parties, as well as Mr. McCarthy, to submit any documentary evidence they wished the Court to consider in ruling on Griffin's motion.

Pursuant to the Court's order, Griffin submitted a number of materials for the Court's consideration, most of which were text messages or memoranda sent by Mr. McCarthy to Griffin and others, ranging in date from August 2022 to May 2024.  Mr. McCarthy did not submit any materials beyond what he presented during the evidentiary hearing.

The government did not submit any additional factual materials before filing its opposition to Griffin's motion.

**DISCUSSION**

I.    <u>Legal Standard</u>

Pursuant to Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure, a defendant may withdraw a guilty plea prior to sentencing if the defendant can "show a fair and just reason for requesting the withdrawal."  "The defendant bears the burden of showing that there are valid grounds for withdrawal." <u>United States v. Rivernider</u>, 828 F.3d 91, 104 (2d Cir. 2016).[8]  That burden is "stringent" "because society has a strong interest in the finality of guilty pleas." <u>United States v. Albarran</u>, 943 F.3d 106, 118 (2d Cir. 2019).  "Accordingly, a defendant's reevaluation of the government's case against him does not justify withdrawal of a plea." <u>Id.</u>

---

[8]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Nor may a defendant be allowed to "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." United States v. Hyde, 520 U.S. 670, 677 (1997).

When examining whether a defendant has met his burden, "a district court considers, inter alia: (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion . . . ; and (3) whether the government would be prejudiced by a withdrawal of the plea." United States v. Rivernider, 828 F.3d at 104. Additionally, when "a motion to withdraw a plea is premised on involuntariness, the defendant must raise a significant question about the voluntariness of the original plea." United States v. Doe, 537 F.3d 204, 211 (2d Cir. 2008). A defendant's self-incriminating statements made under oath at the plea colloquy "carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). Therefore, "[a] defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." United States v. Doe, 537 F.3d at 211.

II.    Analysis

Griffin argues he should be allowed to withdraw his guilty plea because it was involuntary and he was misled as to the strength of the government's case against him.

The Court is not persuaded.

A.    Voluntariness

The voluntariness of Griffin's guilty plea is the dispositive issue here. See United States v. Albarran, 943 F.3d at 124; see also United States v. Rosen, 409 F.3d 535, 548 (2d Cir. 2005) ("Where the motion argues that the plea was not voluntary, a fortiori the court must focus on voluntariness."). If a Court rejects a defendant's claim of involuntariness, then that finding alone

is sufficient to reject the defendant's motion to withdraw his guilty plea.  See United States v.

Morton, 2020 WL 6151265, at *19 (S.D.N.Y. Oct. 20, 2020).

For the reasons that follow, the Court finds that Griffin voluntarily pleaded guilty.

1.    Griffin's Statements During the Change of Plea Hearing

As a threshold matter, "sworn testimony given during a plea colloquy carries such a

strong presumption of accuracy" that district courts are entitled to "discredit[] later self-serving

and contradictory testimony as to whether a plea was knowingly and intelligently made," unless

there is "a substantial reason to find otherwise."  United States v. Riverider, 828 F.3d at 105.

An "extensive" plea colloquy in which the defendant affirmatively testified he was voluntarily

pleading guilty is significant evidence of voluntariness.  Id.

Here, Judge Reznik conducted a thorough and exhaustive plea colloquy with Griffin.  Not

only did the magistrate judge comprehensively review the terms of the plea agreement with

Griffin, she called two recesses in response to his apparent hesitation so that he could confer with

Mr. McCarthy.  During the hearing, Griffin confirmed that (i) no one threatened or coerced him,

or promised him anything outside of the plea agreement, to induce him to plead guilty; (ii) he

signed the plea agreement freely and voluntarily; and (iii) he was satisfied with Mr. McCarthy's

representation of him.  Indeed, Griffin made several of these affirmations after Judge Reznik

allowed him to confer with Mr. McCarthy.  After the second recess, he provided the factual basis

for his guilty plea and admitted to providing money or something of value to Dyckman in

exchange for access to the Arlo Lane facility to dump otherwise prohibited materials; to

submitting sham bids; and to knowing his conduct was wrong or illegal.  At the conclusion of the

colloquy, the magistrate judge asked him "in light of everything that has been said here today, is

it still your wish to plead guilty?"  Griffin responded, "Yes."  (Plea Hr'g Tr. at 43).

24

In short, Judge Reznik gave Griffin "every chance . . . to raise any concerns, questions or anxieties about the plea" and, when he did so, she gave him the opportunity to address them to his satisfaction.  United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1999).  Yet Griffin still chose to plead guilty.

          2.    <u>Mr. McCarthy's Conduct Before the Plea Offer</u>

Griffin's allegations about Mr. McCarthy's conduct prior to the guilty plea do not create a "substantial reason" to deviate from the norm of accepting the "presumption of accuracy" attached to his statements at the plea hearing.  United States v. Rivernider, 828 F.3d at 105.

To begin, Mr. McCarthy's explanation that he minimized Griffin's chances of incarceration <u>before</u> the unsealing of the indictment in May 2022, but revised his opinion <u>after</u> the unsealing, is credible and undercuts Griffin's allegations.  Griffin and his wife claim that Mr. McCarthy promised Griffin would "not go to jail" at the conclusion of the case, and that Mr. McCarthy continued "[t]hese reassurances . . . until August 2024."  (Griffin Decl. at ¶ 7; Cheryl Griffin Decl. at ¶¶ 4, 7).  However, Mr. McCarthy testified that, although he did assure Griffin that incarceration was unlikely when the case appeared to focus on illegal dumping allegations, he changed his assessment—and ceased making those assurances—after the indictment was unsealed and he understood the scope of the government's allegations and evidence.  Notably, Ms. Hughes testified she never heard Mr. McCarthy promise Griffin he would avoid incarceration.

The Court finds Mr. McCarthy's testimony on this point to be credible.  It makes logical sense, and tracks with the natural development of a criminal defense representation, that Mr. McCarthy's opinion of the case evolved as more information became available.

The text messages between Griffin and Mr. McCarthy do not undermine this conclusion. Griffin places a great deal of weight on these messages, which show him and Mr. McCarthy discussing the case in the years after the indictment was unsealed.  In several, Mr. McCarthy assures Griffin that they have had success in challenging certain elements of the government's case.  In one, sent on August 1, 2022, McCarthy wrote to Griffin, "You are not going to jail, period."  (Doc. #100-5).

To be sure, the August 1, 2022, message reveals that, even after the indictment was unsealed, Mr. McCarthy assured Griffin at least once he would not go to jail—contrary to Mr. McCarthy's testimony.  But one text message sent more than two years before the August 26, 2024, plea hearing does not conclusively demonstrate that Mr. McCarthy repeated that assurance until August 2024.  The Court declines to place decisive weight on the text messages, given the frequency with which Griffin and Mr. McCarthy communicated.  Even viewed as a whole, the documentary evidence submitted by Griffin does not undercut the credibility of Mr. McCarthy's core testimony—that he told Griffin his honest view of the case, which changed for the worse as the case developed.

Viewing the evidentiary record as a whole, it is clear that Mr. McCarthy's analysis of the case became pessimistic over time, albeit not in as stark a manner as he described on the stand. At most, the evidence submitted by Griffin reveals that Mr. McCarthy's testimony oversimplified the complicated history of this case and the evolution of his professional analysis.

The Court is also not persuaded by Griffin's claim that Mr. McCarthy improperly pressured him to plead guilty by refusing to represent him if he chose to proceed to trial.

More to the point, Mr. McCarthy did not improperly coerce Griffin by providing his honest judgment.  Griffin emphasizes Mr. McCarthy's testimony that he repeatedly told Griffin

the case was a "loser" and Mr. McCarthy would not represent him if Griffin chose to go to trial. (Evidentiary Hr'g at Tr. 112, 176). However, "defense counsel's blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea," does not "constitute improper behavior or coercion that would suffice to invalidate a plea." United States v. Juncal, 245 F.3d 166, 172 (2d Cir. 2001). And Mr. McCarthy explained he told Griffin, "I'm not going to take you [to trial] just to make money on a . . . suicidal trial." (Evidentiary Hr'g at Tr. 177). Thus, Mr. McCarthy's stated refusal to represent Griffin at trial was rooted his belief that trial was not the best choice for Griffin. Also, Griffin is a wealthy individual with multiple attorneys on retainer. Especially in light of Griffin's resources, the potential loss of Mr. McCarthy's representation was not unduly coercive.

Here as well, Griffin points to the text messages between him and Mr. McCarthy to show that Mr. McCarthy did not always believe the case to be a "loser," but Griffin runs into the incompatibility of his two points. He fails to acknowledge the inherent contradiction between his assertion that Mr. McCarthy assured him he would avoid jail and his assertion that Mr. McCarthy pressured him to plead guilty because the case was ironclad. In other words, Griffin cannot argue that Mr. McCarthy lulled him into pleading guilty by underplaying the severity of the case and, at the same time, coerced him into pleading guilty by calling the case a "loser." Griffin cannot have it both ways.

Mr. McCarthy's blunt appraisal of Griffin's likelihood of success at trial does not render Griffin's plea involuntary.

3.    Mr. McCarthy's Conduct After the Plea Offer But Before the Plea

Griffin's allegation that Mr. McCarthy "did not review the entire plea agreement with [him] in advance" of the August 26 hearing is also belied by the evidentiary record. Mr.

27

McCarthy estimated that he spoke to Griffin about the plea agreement "a few dozen times" between receiving the document from the government on August 6 and the hearing on August 26. (Evidentiary Hr'g at Tr. 106). Additionally, his billing records for that period, which he submitted to the Court, show that he frequently communicated with Griffin. Also, when Mr. McCarthy informed Judge Reznik that he had discussed the agreement with Griffin "on a dozen other days" in addition to the morning of August 26, Griffin did not contest that assertion. (Plea Hr'g, at Tr. 19–20).

Ms. Hughes's testimony is particularly critical in corroborating Mr. McCarthy's testimony on this point. She credibly testified that she observed Griffin and Mr. McCarthy discuss the proposed plea agreement on multiple occasions; in her words, "August . . . pretty much was entirely focused on Glenn." (Evidentiary Hr'g, Tr. at 196). Ms. Hughes's credibility is bolstered by her acknowledgment that she did not remember the specific dates and times of these discussions, but rather remembered that period as filled with extensive conversations with Griffin about the plea offer and the plea agreement.

Given the volume of communication between Griffin and Mr. McCarthy in the weeks preceding the plea hearing, not to mention Griffin's demonstrated vigor in participating in his defense, it would defy common sense to find that they never discussed the provisions of the plea agreement.

    4.   <u>Mr. McCarthy's Conduct at the Change of Plea Hearing</u>

As for the plea hearing itself, Griffin's testimony corroborates, rather than contradicts, the testimony of Mr. McCarthy and Ms. Hughes. All three testified that, on the morning of August 26, Griffin hesitated about going through with the guilty plea and was abrasive toward Mr. McCarthy. According to Griffin, Mr. McCarthy told him, "[I]f you don't want to do this,

great, . . . just let me know what you want to do, because you know the consequences, and it's not going to be good for you." (Evidentiary Hr'g, Tr. at 231–32). Mr. McCarthy and Ms. Hughes confirmed that Mr. McCarthy told Griffin he had the right not to go forward with the plea, but Griffin decided to move forward. As such, there is no dispute Mr. McCarthy gave Griffin the option of calling off the guilty plea, yet Griffin chose to plead guilty.

Griffin's testimony regarding the hearing is simply not credible insofar as it diverges from Mr. McCarthy's and Ms. Hughes's. For example, Griffin testified he stayed in the courtroom during the second recess and did not discuss any questions with Mr. McCarthy, who told him to respond "yes" to any questions asked. But both Mr. McCarthy and Ms. Hughes testified Mr. McCarthy reviewed the questions and answers with Griffin before returning to the courtroom. The Court does not credit Griffin's testimony on this point, because it is exceptionally unlikely that Mr. McCarthy would not review the questions with his client before immediately returning to court—especially considering Griffin's demonstrated hesitation. Again, Ms. Hughes's credible testimony is particularly significant in corroborating Mr. McCarthy's testimony in this regard.

As for Griffin's testimony that he was "scared" during the plea hearing and did not understand the proceedings, "virtually every criminal defendant encounters additional sources of stress that flow from a criminal prosecution and its attendant consequences." United States v. Morton, 2020 WL 6151265, at *14. This is particularly true when a defendant is faced with "two unpalatable options:" pleading guilty or proceeding to trial. United States v. Doe, 537 F.3d at 212. Therefore, it is "commonplace" for defendants in this position to "feel coerced in the lay sense of the word," but that does not make their guilty pleas involuntary. United States v. Juncal, 245 F.3d at 174.

At bottom, Griffin testified that, on August 26, Mr. McCarthy encouraged him to plead guilty but made clear that the choice was Griffin's alone. Not only does Griffin's testimony undermine his claim that Mr. McCarthy coerced him to plead guilty, but it reinforces the presumption of verity attached to the statements he made during the plea colloquy.

     5.   <u>Analogous Caselaw</u>

Finally, Griffin identifies no comparable case in which a district court allowed a similarly situated defendant to withdraw a guilty plea. The precedents he points to are distinguishable. For example, in <u>United States v. Rowe</u>, 2005 WL 659197, at *2 (S.D.N.Y. Mar. 21, 2005), the defendant entered a guilty plea the same day he first indicated he wanted to plead guilty, which happened to be the fifth day of his trial. As such, the district court later allowed him to withdraw the plea in light of the "time pressures involved" in his decision. <u>Id</u>. The district court in <u>United States v. Ramos</u>, 2005 WL 120230, at *2 (S.D.N.Y. Jan. 20, 2005) allowed the defendant to withdraw his guilty plea because defense counsel admitted to "rush[ing] him to take a plea" and "apologize[d] . . . for that." And in <u>United States v. Garcia</u>, 648 F. Supp. 3d 480, 483–84 (S.D.N.Y. 2022), the district court granted the defendant's motion after reviewing a recording of a conversation between defense counsel, the defendant, and the mother of his daughter, in which defense counsel told defendant "in a very loud voice" that he would "never see [his daughter] again, unless behind bars" if he went to trial.

None of those cases is applicable. The Second Circuit and district courts have repeatedly rejected defendants' attempts to withdraw their guilty pleas by raising arguments of involuntariness rooted in the inherent pressure of pleading guilty in order to avoid a potential conviction at trial. <u>See, e.g.</u>, <u>United States v. Doe</u>, 537 F.3d at 212; <u>United States v. Juncal</u>, 245

F.3d at 173; <u>United States v. Farooq</u>, 2020 WL 1083624 at *5 (E.D.N.Y. Mar. 6, 2020). Despite

his arguments to the contrary, Griffin's motion is no different.

In sum, the Court finds that Griffin's guilty plea was knowing and voluntary.[9]

B.    Other Factors

Putting aside the Court's central finding that Griffin's plea was voluntary, the other

relevant factors—(i) whether Griffin adequately advanced a claim of legal innocence, (ii)

whether he delayed in moving to withdraw his plea, and (iii) whether the government would

suffer prejudice if Griffin was allowed to withdraw his plea—do not create a "fair and just"

reason to allow Griffin to withdraw his guilty plea. Fed. R. Crim. P. 11(d)(2)(B). Rather,

Griffin's arguments demonstrate only that he "reevaluat[ed] . . . the government's case against

him," and such a reevaluation "does not justify withdrawal of a plea." <u>United States v. Albarran</u>,

943 F.3d at 118.

1.    Legal Innocence

Although Griffin does not frame his argument in this manner, by contending that

knowledge of certain "intervening developments" "would have influenced [his] calculus in

deciding" to plead guilty, Griffin appears to argue that those intervening developments

demonstrate his legal innocence. (Def. Mem. at 12). In other words, Griffin impliedly contends

---

[9]    In his reply brief, Griffin argues that Mr. McCarthy's representation of him was
constitutionally ineffective, thereby making Griffin's guilty plea "involuntary." (Def. Reply at
20); <u>see generally</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1985). Although a "showing of
ineffective assistance of counsel may undermine the voluntary and intelligent nature of a
defendant's nature to plead guilty," Griffin's arguments in support of his ineffectiveness claim
are essentially duplicative of his arguments in support of his involuntariness claim. <u>United
States v. Thomas</u>, 651 F. Supp. 3d 685, 692 (S.D.N.Y. 2023). As such, because Mr. McCarthy
"did not provide incorrect legal advice" in connection with the guilty plea, his representation was
not constitutionally ineffective and, accordingly, did not render Griffin's guilty plea involuntary.
<u>United States v. Bazemore</u>, 2023 WL 2591020, at *2 (2d Cir. Mar. 22, 2023) (summary order).

the purported intervening developments revealed the government's case to be so weak that a jury would be unlikely to convict him at trial.

The Court is not persuaded.[10]

If a defendant raises a claim of legal innocence, courts examine whether the government's legal theories were sound in light of the existing evidence.  See United States v. Albarran, 943 F.3d at 118–19.  To find in the defendant's favor on this factor, the Court must "be convinced that there are legally cognizable defenses to the crime charged to exculpate the defendant."  United States v. Thomas, 651 F. Supp. 3d 685, 693 (S.D.N.Y. 2023).

To be clear, courts consider whether a defendant's misconceptions affected, or could have affected, his decision to plead guilty.  See United States v. Freeman, 17 F.4th 255, 263–64 (2d Cir. 2021).  But that inquiry typically focuses on whether district courts erred by providing defendants with erroneous information, particularly regarding mandatory minimum penalties, during plea colloquies.  See id.  Both cases Griffin cites in support of his intervening developments theory address this question.  See United States v. Gonzalez, 420 F.3d 111, 119–20 (2d Cir. 2005); United States v. Harrington, 354 F.3d 178, 184 (2d Cir. 2004).

Here, Griffin does not allege Judge Reznik misstated the mandatory minimum penalty he would face.  Rather, he maintains Mr. McCarthy overstated the strength of the government's case, causing Griffin to plead guilty out of the mistaken fear of the sentence he would face if convicted at trial.

---

[10]    It is unclear if Griffin references these intervening developments in support of his voluntariness argument, or in support for an argument of legal innocence.  To the extent he intends the former, that does not alter the Court's determination that Griffin's plea was voluntary for the above reasons.

Regardless of his argument's legal underpinnings, Griffin's purported intervening developments involve misstatements of the factual and legal landscape.

First, the evidentiary record demonstrates Mr. McCarthy diligently investigated Dena Burke's flaws as a government witness well in advance of the August 26, 2024, plea hearing. Griffin claims that Mr. McCarthy did not pursue exculpatory leads, and more specifically the Ms. Burke angle to the case, before the plea hearing. The specificity and detail of Mr. McCarthy's testimony on this point, combined with the documentary evidence—specifically, the February 2023 statement obtained by Dyckman's counsel and the July 2023 affidavit obtained by Mr. McCarthy—refute Griffin's allegations.

Also, although Griffin acknowledges Mr. McCarthy interviewed Ms. Burke in July 2023, he maintains she "fully recant[ed]" her grand jury testimony in her November 11, 2024, interview with Mr. McCarthy. (Def. Mem. at 13). Yet that overlooks the February 2023 statement, in which Ms. Burke also walked back significant portions of her grand jury testimony. Therefore, Ms. Burke's November 2024 statements were, at most, the latest step in a recantation journey she began well over a year before. They were plainly not, to use Griffin's words, "newly discovered evidence." (Id. at 14).

Moreover, at the December 5 evidentiary hearing, the government acknowledged that Mr. McCarthy and Dyckman's counsel raised issues relating to Ms. Burke's credibility in 2023. Given the frequency and depth of communication between Griffin and Mr. McCarthy, it strains credulity to maintain that, before November 2024, Griffin was not aware of the challenges Ms. Burke's evolving narrative posed to the government's case against him. Factual assertions of which the defendant "was well aware . . . when he decided to enter a guilty plea" do not

"establish legal innocence or provide an adequate reason to disturb his guilty plea." United States v. Albarran, 943 F.3d at 123.

Griffin's broader argument that Ms. Burke's testimony was "the sole evidentiary support that any bribery occurred" is also inaccurate. (Def. Reply at 10). Essentially, he contends that without Ms. Burke's testimony that Griffin gave Dyckman envelopes filled with cash, the government's evidence shows only an agreement to pay gratuities as thanks for access to the Arlo Lane facility—which, under controlling Supreme Court law, is legal. See Snyder v. United States, 603 U.S. 1, 19 (2024); McDonnell v. United States, 579 U.S. 550, 579 (2016).

However, Griffin misstates the significance of Ms. Burke's statements. The Court in Snyder held that a public official commits bribery "when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." 603 U.S. at 19. The text messages Griffin sent to Dyckman are strong evidence of "an agreement to a future reward for a future official act." Id. When coordinating Griffin's access to the Arlo Lane facility in December 2018, Griffin texted Dyckman "I will take care of u for sure." (Indictment at ¶ 10(b)(iii)). A day later, Griffin texted Dyckman "We will be there 830-900 .. and I want to take care of u guys I don't want it for nothing." (Id. at ¶ 10(b)(v)). However much Griffin contends the texts reveal only a legal gratuity arrangement, a properly instructed jury could find them to be evidence of a corrupt bribery scheme—even without considering the other evidence presented by the government. The government's bribery case does not "rest[] on fragile and speculative grounds," meaning Mr. McCarthy's representations about the strength of the government's case were not obviously false. (Def. Reply at 11).

It follows that Griffin's focus on Ms. Burke as "crucial to sustaining [his] plea" to the bribery conspiracy charge in the superseding information is misplaced. (Def. Mem. at 13). The

government did not reference Ms. Burke's testimony at all when, during the plea hearing, it recited the evidence that supported the bribery conspiracy charge. Instead, it referenced the texts sent between Griffin and Dyckman. Under Rule 11, Judge Reznik was required merely to "determine that there [was] a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). Because Griffin pleaded guilty to a bribery <u>conspiracy</u> charge, the text messages, not to mention the other evidence cited by the government, were more than sufficient to satisfy Rule 11.

Second, Griffin is no more successful in trying to withdraw his guilty plea by challenging the Section 1028A charge contained in the indictment. As a starting point, courts typically consider the charges to which a defendant <u>pleaded</u> guilty—not the charges which a defendant might have faced at trial. <u>See</u> <u>United States v. Albarran</u>, 943 F.3d at 118–19. But Griffin did not plead guilty to violating Section 1028A, and he cites no case in which a court allowed a defendant to withdraw a guilty plea based on a legal innocence challenge to a charge to which he did not plead guilty.

Further, although Mr. McCarthy admittedly did not explain the details of the "evolving" legal landscape of Section 1028A to Griffin, he maintained he informed Griffin that Count Seven—the aggravated identity charge—was "triable," again, meaning a conviction was not a certainty. (Evidentiary Hr'g, Tr. at 69–70). The Court finds that testimony credible. As such, the Court is not persuaded by Griffin's position that he pleaded guilty because Mr. McCarthy never informed him the government's case on that charge was flawed. Griffin contests the underlying merits of the Section 1028A charge, but the Court need not consider that subject beyond observing that the government's case has merit—and certainly is not weak enough that the Court is convinced Griffin has raised an exculpatory "legally cognizable" defense. <u>United States v. Thomas</u>, 651 F. Supp. 3d at 693.

35

Mr. McCarthy informed Griffin that he might win at trial on Count Seven, but the government's case was not obviously infirm.  That analysis did not coerce Griffin to plead guilty.  Allowing Griffin to withdraw his guilty plea because he later received a different opinion from a new attorney would "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess."  United States v. Hyde, 520 U.S. at 677.

Third, Griffin's challenge to the loss calculation contained within the plea agreement has no bearing on the Court's analysis.  He contends that the $1.2 million loss amount included in the plea agreement was coercive because the government used "inflated loss figures" to pressure him to plead guilty.  (Def. Reply at 19).  But this claim does not fit even tangentially into a legal innocence rubric, nor does Griffin cite any case in which a court has considered loss calculations contained within a plea agreement when allowing a defendant to withdraw a guilty plea.  Instead, this argument is a back-door attempt for Griffin to once again challenge the loss amount in his plea agreement, which "passionately upset" him during plea negotiations.  (Evidentiary Hr'g, Tr. at 114).  As such, it is irrelevant and the Court need not consider it further.

### 2.    Delay Between the Plea Hearing and Griffin's Motion to Withdraw

Although Griffin moved to withdraw his guilty plea almost three months after the August 26 change of plea hearing, the Court does not find his delay was a strategic ploy.  To be sure, the Second Circuit and district courts have found that a months-long delay weighs against granting a defendant's motion to withdraw.  See, e.g., United States v. Doe, 537 F.3d at 213; United States v. Thomas, 651 F. Supp. 3d at 693.  But here, that delay was mitigated by Griffin's retention of new defense counsel.  The Court credits counsel's representation that diligently investigating "whether there were valid grounds" for moving to withdraw Griffin's guilty plea took time, and that counsel filed Griffin's motion as soon as practicable.  (Doc. #111 at ¶ 12).  Yet the absence

36

of a strategic delay is ancillary to the Court's analysis and does not outweigh the voluntary nature of Griffin's guilty plea.

        3.      <u>Prejudice Suffered by the Government</u>

The government correctly contends it is not required to show prejudice if a defendant has failed to show sufficient grounds for withdrawing his guilty plea. <u>See</u> <u>United States v. Gonzalez</u>, 2023 WL 7151596, at *4 (S.D.N.Y. Oct. 31, 2023). Because Griffin has failed to meet his burden, the Court need not—and does not—consider whether the government would suffer any prejudice in the event Griffin withdrew his guilty plea.

## CONCLUSION

Griffin's motion to withdraw his guilty plea is DENIED.

Griffin's sentencing shall proceed on April 22, 2025, at 10:00 a.m. The government's sentencing submission is due by April 8, 2025. If Griffin wishes to file a reply to the government's sentencing submission, he may do so by April 15, 2025.

The Clerk is instructed to terminate the motion. (Doc. #87).

Dated: March 13, 2025
       White Plains, NY              SO ORDERED:

                                            Vincent L. Briccetti
                                            United States District Judge